Charles R. Rhoades and Catherine Rhoades v. Commissioner.
Rhoades v. Commissioner
Docket No. 2193-62.
United States Tax Court
T.C. Memo 1964-332; 1964 Tax Ct. Memo LEXIS 5; 23 T.C.M. (CCH) 2056; T.C.M. (RIA) 64332; December 29, 1964
Robert G. MacAlister, Grant Bldg., Pittsburgh, Pa., for the petitioners. Hobart Richey, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: A deficiency in the income tax of petitioners for the taxable year 1958 has been determined by the Commissioner in the amount of $1,176.61. The primary question here presented is whether respondent has *6 erred in disallowing as business expense deductions certain traveling expense sought to be deducted under section 162, Internal Revenue Code of 1954, as trade or business expense. In the alternative, the question is whether such expenses are deductible under section 212(1) as expenses paid or incurred for the production or collection of income. Findings of Fact All agreed facts are found as stipulated. The word "petitioner" as hereinafter used has reference to Charles R. Rhoades only. Petitioners reside at Pittsburgh, Pennsylvania, and filed the joint income tax return for the calendar year 1958 with the district director at that city. During the years 1928 through 1932, petitioner served in the United States Navy. During such service he devised a phonetic form of shorthand used to take notes while on duty. There was up to the end of 1958 no commercial development of this idea. Petitioner was employed as an operator of an oil company gas station during the year 1933. While so employed, petitioner had the idea of making an automatic shutoff device for gasoline tank hoses. There was up to the end of 1958 no commercial development of this idea. In 1934, *7 petitioner was employed by the Pittsburgh Railways Company as a streetcar operator. During that time, petitioner developed the idea of a so-called deadman's switch or pedal designed to be used on autobiles which would stop the car when the pedal was released. He did not attempt to get this device patented and in fact found that such an instrument was already patented by another company. Petitioner was unable to exploit this device on a commercial basis. In 1934, petitioner developed a wrench designed to work in close quarters. He made no attempt to determine whether the wrench was patentable, but rather made it only because he needed it on a specific job. In 1935, petitioner was appointed to the Bureau of Mines. While working for the Bureau of Mines, he operated printing presses. He then developed a device for stopping the presses when they became jammed. He turned this device over to the Bureau of Mines without charge and without receiving anything of value for it. Petitioner went from the Bureau of Mines into the United States Weather Bureau. With the Weather Bureau, he designed a plotting board to be used in computing wind direction and velocity. There was up to the end of *8 1958 no attempt made by petitioner to exploit this device commercially. While with the Weather Bureau, petitioner was assigned as Hydrologic Officer, requiring him to make readings of snow and rain gauges over a number of states. Petitioner devised an instrument for easily and satisfactorily measuring snowfall. He gave the instrument to the Weather Bureau and made no effort to patent or commercially develop the same. Petitioner was employed by the Westinghouse Electric Company in 1943 in Pittsburgh, Pennsylvania. He worked on the problems of electrical control of submarine storage batteries. He conceived a way of eliminating costly machining and changes in the manufacturing process so that many thousands of dollars were saved in manufacturing each control. This particular conception was not novel, but merely a new approach using tools already developed. There was up to the end of 1958 no commercial development of this idea individually by petitioner. In 1944, petitioner entered the employment of Methods Engineering Counsel of Pittsburgh as a consulting engineer. There was no development of any of his individually conceived devices on a commercial basis during this period of employment. *9 During 1958, petitioner attempted to develop a mechanical method of putting chains on the wheels of a car while it was in motion. There was up to the end of 1958 no commercial development of this method. Petitioner had sometime prior to 1958 developed a device for lifting motors and other heavy articles out of confined places. There was up to the end of 1958 no commercial development thereof. Prior to 1958, petitioner made a device for pilot determination of the ground speed of an airplane while in flight. He made only one or two models similar to this device and gave them to people for their personal use. There was up to the end of 1958 no commercial exploitation of this instrument. Beginning in 1958, petitioner made from time to time models of a ground effect machine or a device that travels over land and water without any wheels or any other support or being in direct contract with the supporting surface. There was up to the end of 1958 no commercial development of this project or idea. Beginning in 1946 or 1947, because of a defective ear, petitioner came to know two ear specialists named Doctors Day and Jordan. As a result of his interest in things mechanical, petitioner *10 became involved in the mechanical aspects of the doctors' work. He placed his ability to design tools at their disposal in an attempt to make their operation procedures shorter and easier. From time to time petitioner suggested changes which did improve the mechanical techniques of various ear operations. He helped the doctors to solve mechanical problems. After paying for an initial operation in 1947, petitioner was never billed for any operation or other work which was performed for him by Doctors Day or Jordan. Petitioner did this work because he believed there was a need therefore and that it would help other people who had hearing problems similar to his. During all years from 1947, the year of the first operation performed by Doctors Day and Jordan for which he was charged, through 1958, petitioner was covered by hospitalization paid for by his employer, Mason, Shaver & Rhoades, Inc. That hospitalization plan would have borne the expense of any operation performed by Doctors Day and Jordan for petitioner during that period. Petitioner never reported income as a result of work done for Doctors Day and Jordan or any other doctors. Neither did he report income representing *11 the value of operations performed upon him for which he was not charged. One tool developed by petitioner in conjunction with Doctors Day and Jordan is marketed under the name of the "Day-Jordan burr." Neither petitioner nor Doctors Day and Jordan were compensated for this tool. There was by the end of 1958 no commercial development for profit by petitioner of any idea or tools suggested by petitioner in his relations with Doctors Day and Jordan. Petitioner was during 1958 the owner of one-third of the outstanding capital stock of Mason, Shaver & Rhoades, Inc., and was a director and president of that company. From 1945 to the date of trial, petitioner has been a partner, then stockholder and officer of Mason, Shaver & Rhoades, Inc., as well as a new business established by that corporation known as Plastic Molded Parts, Inc. Petitioner was the president of Mason, Shaver & Rhoades Sales, Inc., during the year 1958 and the president of Plastic Molded Parts, Inc., during the same period. He owned all the stock in Precision Parts, Inc., during the year 1958. Mason, Shaver & Rhoades, Inc., was a corporation whose business consisted of solving problems of various manufacturers *12 of the type which had never before been solved. Petitioner joined this organization with Shaver and Mason because he believed that they could profitably supplement his idea ability with their production ability. During the year 1958, petitioner was an officer or employee of four corporations: Mason, Shaver & Rhoades, Inc., Mason, Shaver & Rhoades Sales, Inc., Precision Parts, Inc., and Plastic Molded Parts, Inc. As president and employee of Mason, Shaver & Rhoades, Inc., petitioner designed the tools, looked after office procedure, took care of all contracts, public relations, and was the welfare and security officer of the corporation. In his capacity of idea man for Mason, Shaver & Rhoades, Inc., he was required from time to time to demonstrate to customers or to visit the customer's place of business in order to determine precisely the nature of the problem needing solution. During the year 1958, the four corporations previously mentioned relied extensively upon petitioner's creative ability and knowledge for the production of tools and other products sold by the corporations and for the solution of problems in the machinetool business in which fields the corporations were *13 engaged. Radio Venture - Japan Trip During 1958, petitioner was familiar with the requirements of aircraft for radio navigational equipment. During that year he investigated the requirements necessary to make a radio that would fulfill such needs, drew up some sketches of such a radio, and consulted with persons known to be amateur radio experts with respect thereto. He also consulted electrical and radio engineers as to such requirements. Operating under the assumption that the American radio industry was not interested in his ideas, petitioner determined to approach the Japanese radio industry since it was an established industry which he felt would be a likely source for the low cost construction of the radio he had conceived. Before departing for Japan in November 1958, petitioner was told by Eli Graubart of the Graubart Aviation Company that if petitioner could build a radio along the lines discussed by them, Graubart Aviation would give petitioner an order for 300 of such radios. Petitioner at the time stated to Graubart that he thought that such a radio could be produced. Petitioner carried only sketches of his general ideas with him when he traveled to Japan. He *14 had no working model to display to the Japanese. Petitioner had no representative in Japan and, therefore, spent several days at the beginning of his trip discussing with the Overseas International, Ltd., representation by them of his interests in Japan and with respect to any possible trade later between Japan and the United States. Petitioner traveled from Tokyo to Hong Kong to discuss these arrangements with the home office of Overseas International, Ltd. After arranging for his representation by Overseas International, Ltd., petitioner discussed with it the list of several corporations to whom he had been referred with respect to their potentiality as possible builders of his radio. Overseas International, Ltd., arranged meetings with only those companies it thought to be qualified to do this type of work for him. Petitioner discussed his idea with six different companies. All but two of the companies found that they could not enter into any negotiations with respect to manufacture of petitioner's radio primarily because they did not have the engineering force available to develop the design thereof to fruition. With the various companies petitioner discussed the type *15 of radio he wanted built, the manner in which he wanted it built, and the preliminary layouts or sketches he had with him. He was immediately asked to furnish Federal Communications Commission requirements for aircraft radios. Petitioner did not furnish any Japanese company with a precise diagram of a radio, but only with general sketches of what he had in mind. He did not furnish a set of specifications to either of the companies. Petitioner departed Japan in early December 1958 because of the illness of his mother, without having concluded either that his idea was capable of being brought to commercial completion or which company would be able to produce the radio. On December 9, 1958, Japan Aviation Electronics Industry, Ltd., furnished petitioner with a set of specifications, indicating one possible approach, with modifications, to the idea he had in mind. On December 30, 1958, Japan Aviation furnished a second set of calculations and estimates with respect to the possible manner of producing the radio originally requested by petitioner. On December 24, 1958, Tokyo Precision Instrument Company addressed a letter to petitioner which was received by him on December 31, 1958. That *16 letter stated that Tokyo Precision Instrument expected to pursue the general idea for an airplane radio discussed while petitioner was in Japan and make a presentation to him. On March 16, 1959, petitioner addressed a letter to the president of Japan Aviation requesting a price quotation from that company for the construction of several sets of the radio recommended by that company. On May 11, 1959, the Tokyo Precision Instrument Company addressed a letter to petitioner stating that they had not been able to complete their presentation, but expected to mail it to him in the near future. In March 1959, Japan Aviation indicated it could furnish a radio of the general type desired but requested a deposit before proceeding to build a model thereof. In June 1959, petitioner was advised by Tokyo Precision Instrument Company that it could produce a radio of the general type required by him, but needed $20,000 in order to build a working model. At this time petitioner decided not to proceed further with this venture. Petitioner had not discussed financing of a pilot or model project at the time he was in Japan, and the request for $20,000 from Tokyo Precision Instrument Company in *17 June 1959 was the first request for payment made by that company. During the period after his return to the United States in December 1958 until the project was halted in the summer of 1959, both companies, Tokyo Precision Instrument Company and Japan Aviation, made a number of suggestions for changes in the proposed radio which required reconsideration on the part of petitioner. Throughout the negotiations with both companies after petitioner's return from Japan in December 1958 until he dropped the project in the summer of 1959, petitioner encountered both technical and monetary problems in producing the envisaged aircraft radio. He at all times had the funds necessary to defray the monetary problems. Petitioner furnished the Federal Communications Commission specifications for such radios upon his return to the United States but after December 31, 1958. For personal reasons petitioner was unable to complete the preparations necessary to launch the radio venture without making a return trip to Japan, which he had not managed at any time up to the date of the trial hereof. During 1958, petitioner incurred expenses in the amount of $2,077.33 in connection with his above-described *18 traveling from Pittsburgh, Pennsylvania, to Tokyo, Japan; Taipei, Taiwan and Hong Kong and return. Ultimate Findings of Fact Petitioner was not in the trade or business in 1958 of creating mechanical devices and developing ideas for profit. In 1958, petitioner was in the trade or business of being an officer and employee of Mason, Shaver & Rhoades, Inc., Mason, Shaver & Rhoades Sales, Inc., Precision Parts, Inc., and Plastic Molded Parts, Inc. Petitioner was not in the trade or business of manufacturing aircraft radios in 1958 at the time of his trip to Japan. The expenditures in question for the year 1958 were incurred in a prebusiness status and not for the production or collection of income from an existing interest. Opinion On brief petitioner claims the right to deduct the travel expenses here involved (the amount of which is not in dispute) for the following stated reasons: that he "was engaged in the business of designing and building mechanical contrivances"; that he "expended money in research and experimental expenses in connection with many of the ventures which he engaged in as a business in designing and building mechanical contrivances"; that he "paid travel *19 expenses in connection with his business of designing and building mechanical contrivances"; that he "incurred expenses for the 'production of income'"; and that his "activities were the result of his desire to make profit." We think the facts presented by this record prove the direct opposite to his stated reasons or completely fail to substantiate them. It is devoid of any evidence which would provide deductibility for the involved expenses under section 174 of the 1954 Code insofar as the election therein required is concerned and indeed we do not understand petitioner to have made a claim for deductibility under that section. The evidence before us rather strikingly demonstrates that petitioner's activity in the designing and building of mechanical contrivances, except for his employment as a consulting engineer, was a hobby and was carried on by him without a profit motive. He either donated the results of such activity to others or made no real attempt to exploit them. That he expended money in connection with these activities is to be presumed, but such expenses we think were clearly the expenses incidental to his hobby. The expenses of petitioner's trip to and within Japan *20 in 1958 are here clearly shown to have been capital in nature and not therefore deductible as business expense. They were paid or incurred in the attempted creation of a business of manufacturing and selling an aircraft navigational radio. This being true, they cannot be said to be deductible business expenses. Frank B. Polachek, 22 T.C. 858; Morton Frank, 20 T.C. 511; George C. Westervelt, 8 T.C. 1248. We find that respondent's determination must be sustained on this issue. Petitioner's alternative contention is equally without merit. He seeks deduction of his traveling expense under section 212(1) of the 1954 Code [1] on the ground that while traveling to Japan for the purpose of discovering a low-cost manufacturing source for the designing and production of his radio, he was engaged in the production or collection of income within the meaning of that section. The record supports an opposite conclusion. His own testimony negatives the contention that his venture into the navigational radio field was an existing trade or business at the date of his trip to Japan or indeed that it has ever become such. His testimony clearly demonstrates the fact *21 that at that time he was endeavoring to establish such a trade or business and, further, that he has never succeeded in doing so. This state of facts is inconsistent with the intendments of section 212(1). That section provides a deduction for the expenses incident to the production or collection of income in transactions other than the conduct of a trade or business. McDonald v. Commissioner, 323 U.S. 57; see Eugene H. Walet, Jr., 31 T.C. 461, affirmed per curiam 272 F. 2d 694. It is clear to us that petitioner's efforts in Japan were not intended to produce or collect income, but instead constituted an attempt to create a vehicle or tool (trade or business) which in turn might, if he had been successful, be used for that purpose. As we have indicated above, even success in his venture would not afford deductibility for his traveling expenses, but would have necessitated their recovery only upon the sale or exchange of such a business as part of the cost basis thereof. *22 We sustain respondent's determination on this issue also. Decision will be entered for the respondent. Footnotes
1. SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year - (1) for the production or collection of income;↩